**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ROME DIVISION**

| | |
|---|---|
| IN RE:<br><br>**BEAULIEU GROUP, LLC, et al.,**<br><br>Debtors.<br>―――――――――――――<br><br>**PMCM 2, LLC, as the Liquidating Trustee**<br>**for the Beaulieu Liquidating Trust,**<br><br>Plaintiff,<br><br>V.<br><br>**FABRIC SOURCES, INC. AND FABRIC**<br>**SOURCES INTERNATIONAL, LLC,**<br><br>Defendants.<br>―――――――――――――| )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **CHAPTER 11**<br><br>**Jointly Administered Under**<br><br>**CASE NO. 17-41677-BEM**<br><br><br><br><br><br>**Adversary Proceeding**<br><br>**No. 19-04036-BEM** |

<u>**RESPONSE IN OPPOSITION TO DEFENDANT FABRIC SOURCES, LLC'S MOTION**</u>
<u>**FOR PARTIAL SUMMARY JUDGMENT**</u>

Plaintiff PMCM 2, LLC, as the Liquidating Trustee for the Beaulieu Liquidating Trust, (the "**Plaintiff**" or the "**Trustee**") responds to and opposes the Defendant Fabric Sources International, LLC's Motion for Partial Summary Judgment (the "**Motion**") and accompanying memorandum (the "**Brief**"), each filed on November 20, 2019 (Adv. Pro. Dkt. Nos. 22 & 23) by Defendant Fabric Sources International, LLC (the "**Defendant**"), and respectfully shows:

## I. STATEMENT OF FACTS

### A.      Procedural History

On July 16, 2017 (the "**Petition Date**"), Beaulieu Group, LLC ("**Beaulieu**" or the **Debtor**"), Beaulieu Trucking, LLC ("**Trucking**") and Beaulieu of America, Inc. ("**America**" and together with Beaulieu and Trucking, the "**Debtors**"), each filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, thereby commencing the above-captioned jointly-administered cases (the "**Bankruptcy Case**"). *See Complaint (I) Objecting to Claims and (II) Seeking to Avoid and Recover Transfers* [Adv. Pro. Dkt. No. 1] (the "**Complaint**"), ¶ 1; *Defendant Fabric Sources International, LLC's (I) Answer and Affirmative Response to Plaintiff's Complaint and (II) Counterclaim* [Adv. Pro. Dkt. No. 4] (the "**Answer**"), ¶ 1. On March 14, 2018, Beaulieu, Trucking, and the Official Committee of Unsecured Creditors appointed in the Bankruptcy Case filed a First Amended Joint Plan of Liquidation (the "**Plan**") in the Bankruptcy Case. *See* Bankruptcy Case Dkt. No. 631. On May 2, 2018, the United States Bankruptcy Court for the Northern District of Georgia, Rome Division (the "**Bankruptcy Court**"), entered an order (the "**Confirmation Order**") confirming the Plan. *See* Bankruptcy Case. Dkt. No. 682. The Plan became effective on June 4, 2018 (the "**Effective Date**"). *See* Bankruptcy Case Dkt. No. 704.

On the Effective Date, pursuant to the terms of the Plan, all of the assets of the Debtors, including all causes of action belonging to the Debtors,[1] were transferred to the Beaulieu Liquidating Trust (the "**Trust**"), and the Trustee was appointed as the liquidating trustee of the Trust. *See generally*, Plan and Confirmation Order.

---

[1]      The Plan defines "causes of action" to mean, among other things, any and all actions, claims, demands, rights, defenses, counterclaims, suits, causes of action, liabilities, obligations, debts, judgments, remedies, damages, recoupments, cross claims, counterclaims, third-party claims, indemnity claims, contribution claims, and any other claims, whether known or unknown, foreseen or unforeseen, direct or indirect/derivative, choate or inchoate in law, equity or otherwise, including all avoidance actions and rights to recover transfers voidable or recoverable under Sections 502, 542, 543, 544, 545, 547, 548, 549, 550, 551, and/or 553 of the Bankruptcy Code, and any and all other claims or rights of any value whatsoever, at law or in equity, against any creditor or other third party.

On June 25, 2019, the Trustee commenced the above-captioned adversary proceeding (the "**Adversary Proceeding**") by filing the Complaint. *See* Adv. Pro. Dkt. No. 1. In the Complaint the Trustee sought, among other things, to (a) avoid and recover certain transfers in the amount of no less than $1,229,346.78 (the "**Preference Payments**") made by the Debtor to the Defendant within ninety (90) days of the Petition Date (**Counts V and VI**), (b) object to proof of claim no. 1413 filed by the Defendant in the Bankruptcy Case on or about November 8, 2017 asserting a general unsecured claim against the Debtor's estate in the amount of $1,173,152.49 (the "**Unsecured Claim**") ("**Court III**"), (c) object to a request for payment in the amount of $160,088.92 as an administrative expense claim under section 503(b)(9) of the Bankruptcy Code filed by the Defendant in the Bankruptcy Case on or about November 8, 2017 (the "**503(b)(9) Claim**") ("**Count IV**"), (d) recover certain excessive payments allegedly made by the Debtor to the Defendant after the Petition Date in the amount of $25,463.51 (the "**Overpayments**")("**Count VII**"), and (e) disallow the Unsecured Claim and the 503(b)(9) Claim under section 502(d) of the Bankruptcy Code until and unless the Trustee recovered the Preference Payments and the Overpayment ("**Count VIII**"). *See generally*, Complaint.[2]

On July 26, 2019, the Defendant filed its Answer to the Complaint in which it asserted various affirmative defenses and also asserted two counterclaims against the Trustee, seeking (a) a declaratory judgment determining and declaring that the Defendant's defensive use of new value under Section 547(c)(4) of the Bankruptcy Code for certain goods it provided to the Debtor within twenty (20) days of the Petition Date (the "**503(b)(9) Goods**") did not preclude the Defendant from a distribution on its 503(b)(9) Claim or of its Unsecured Claim, and (b) a declaratory judgment

---

[2] The Counts I and II of the Complaint are now moot and of no issue in this Adversary Proceeding. Moreover, due to a scribner's error, the title of Count IV of the Complaint referred to POC No. 1413 rather than the 503(b)(9) Claim, but the body of the Complaint makes clear that that count was directed at the 503(b)(9) Claim.

that the Trustee cannot use section 502(d) of the Bankruptcy Code to disallow and stop payment on the 503(b)(9) Claim.  *See* Answer, pp. 20-29.  On August 14, 2019, the Trustee filed its *Plaintiff's Answer and Response to Counterclaim of Defendant Fabric Sources International, LLC* [Adv. Pro. Dkt. No. 11] (the "**Reply**").

On November 20, 2019, Defendant filed its Motion and Brief.  Pursuant to the Motion, Defendant seeks summary judgment against the Trustee on the following:

1.      Declaring and adjudicating that Defendant's use of the "new value defense "under section 547(c)(4) of the Bankruptcy Code  does not preclude it from a distribution as an administrative expense for its 503(b)(9) Claim or as a general unsecured claim for its Unsecured Claim ("**Counterclaim Count I**");

2.      Declaring and adjudicating that the Trustee cannot use section 502(d)(2) to disallow and stop payment on the 503(b)(9) Claim ("**Counterclaim Count II and Complaint Count VIII**");

3.      Declaring and adjudicating that the Trustee's objection to the Unsecured Claim is denied ("**Complaint Count III**"); and

4.      Declaring and adjudicating that the Trustee's objection to the 503(b)(9) Claim is denied ("**Complaint Count IV**").

**B.      Factual Background**

The facts of this matter appear to be largely undisputed.  Based on Beaulieu's books and records, information provided by the Defendant, and the *Declaration of Chris Simuro* (the "**Simuro Declaration**") attached as an exhibit to the Motion, the Trustee does not dispute that certain of the Prepetition Transfers made by the Debtor to the Defendant during the 90 days preceding the Petition Date are protected by the Defendant's new value defense.  The Trustee does

not dispute that the Unsecured Claim in the amount of $1,173,154.49 appears to be reasonably calculated, although as discovery has not yet concluded it is possible that there might remain defenses or disputes as to the precise allowable amount of the Unsecured Claim. *See* Declaration of Michael E. Jacoby, attached to the Statement of Material Facts as to Which the Plaintiff Contends a Genuine Issue Exists to be Tried as Exhibit 1, ¶ 5 (hereinafter, the "**Jacoby Declaration, ¶ ___**").The Trustee does not dispute that the 503(b)(9) Claim in the amount of $160,088.92 appears to be reasonably calculated and approximates the value of the 503(b)(9) Goods delivered to the Debtor within twenty days prior to the Petition Date, although as discovery has not yet concluded it is possible that there might remain defenses or disputes as to the precise allowable amount of the 503(b)(9) Claim. *See* Jacoby Declaration, ¶ 6.  The Trustee further agrees that the 503(b)(9) Claim would be allowable as an administrative expense claim under Section 503(b)(9) of the Bankruptcy Code if the Defendant were not also seeking to use the delivery of the goods represented by the 503(b)(9) Claim as part of the Defendant's new value defense to avoidance of the Preference Payments.

With regard to the 503(b)(9) Claim, the Trust has sufficient assets to pay all allowed administrative, secured and priority claims in full, and make a substantial distribution on allowed non-priority unsecured claims. *See* Jacoby Declaration, ¶ 9.  To date, the Trust has paid all allowed administrative, secured and priority claims in full, has distributed 5% of all allowed non-priority unsecured claims under $5,000 (Class 7 Convenience Class Claims under the Plan) to the holders of such claims, which represents the final distribution on such claims, and has paid an interim distribution of approximately 2.2% of all allowed non-priority unsecured claimants over $5,000 (Class 6 General Unsecured Claims under the Plan) to the holders of such claims. *See* Jacoby Declaration, ¶ 10.  Pursuant to the confirmed Plan, the Trust maintains a reserve of the funds

necessary to pay all unresolved administrative claims in the face amount of those claims.[3]  *See* Jacoby Declaration, ¶ 11.  Included in this reserve is $160,088.92, that will be used to satisfy the Defendant's 503(b)(9) Claim if and to the extent the 503(b)(9) Claim is allowed up to its full face amount.  *See* Jacoby Declaration, ¶ 11.

## II. ARGUMENT

### A.    Defendant Should be Denied Judgment on Counterclaim Count I

Defendant's request for summary judgment on Counterclaim Count I should be denied. Defendant cannot double-count the value of the 503(b)(9) Goods as both a 503(b)(9) Claim and as a new value defense under 547(c)(4) of the Bankruptcy Code.

#### *1. Summary of Argument*

The Defendant wishes to use the value of the 503(b)(9) Goods it delivered to the Debtor within twenty days of the Debtor's Petition Date as both a sword and a shield.  The sword is the 503(b)(9) Claim in which the Defendant seeks an affirmative recovery from the funds held in the Trust as an administrative expense claim for the full value of the 503(b)(9) Goods.  The shield is that the Defendant also seeks to use the value of those same 503(b)(9) Goods as a "new value" defense under section 547(c)(4) of the Bankruptcy Code against the Trustee's recovery in the preference action asserted against the Defendant.   In other words, the Defendant asks the Court to allow it to "double-count" the value of the 503(b)(9) Goods, which would not only unduly benefit the Defendant but would unfairly deplete the Trust's limited remaining funds to the detriment of the Debtor's other creditors.

---

[3]      The Trust also maintains reserves for unresolved tax priority and non-tax priority claims in the aggregate of the face amount of the claims, as well as reserves for unresolved general unsecured claims totaling the aggregate of the face amount of those claims multiplied by the amount distributed to general unsecured claims to date.  *See* Jacoby Declaration, ¶ 12.

**2.** *Clear Statutory Analysis Supports the Trustee's Interpretation of the Relevant Statute*

Defendant's argument fails as a matter of straightforward statutory analysis.   The relevant statutes in this Adversary Proceeding are Sections 503(b)(9) and 547(c)(4) of the Bankruptcy Code.   Section 503(b)(9) provides that "after notice and a hearing," there shall be an allowed administrative expense for "the value of any goods received by the debtor within 20 days before [the Petition Date] in which the goods have been sold to the debtor in the ordinary course of the debtor's business."  11 U.S.C. § 503(b)(9).  There is no dispute that this section enables Defendant to have an allowed 503(b)(9) Claim for the value of the 503(b)(9) Goods.

Section 547(c)(4) provides:

> (c)    The trustee may not avoid under this section a transfer . . .
>
>> (4)    to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor –
>>
>>> (A)    not secured by an otherwise unavoidable security interest; and
>>>
>>> (B)    on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor.

11 U.S.C. § 547(c)(4).

There *is* a dispute among the parties in this Adversary Proceeding as to the correct interpretation of this statute.  The Defendant contends that a payment on the 503(b)(9) Claim *would not* constitute an "otherwise unavoidable transfer" that would render the Defendant unable to assert the "new value" defense with respect to the value of the 503(b)(9) Goods that would otherwise be available under Section 547.   The Trustee contends that a payment on the 503(b)(9) Claim *would*

constitute such an unavoidable transfer. A plain reading of the statute supports the Trustee's position.

Statutory construction begins with the language of the statute and "where the language is plain, the sole function of the court is to enforce the statute according to its terms, *unless those terms would lead to an absurd result.*"  *Southern Polymer, Inc. v. TI Acquisition, LLC*, 410 B.R. 742, 748 (Bankr. N.D. Ga. 2009) (emphasis added), *citing Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004).  Interpreting section 547(c)(4) to permit a creditor to double-count the value of the same goods as both a "new value" defense to a preference action *and* as an affirmative recovery under section 503(b)(9) would clearly be just the type of absurd result that the Supreme Court prohibits.

The Eleventh Circuit has expressed the test for statutory interpretation as follows:  "If the 'language at issue has a plain and unambiguous meaning *with regard to the particular dispute in the case*,' and 'the *statutory scheme is coherent and consistent*,' the inquiry is over. . . In determining whether a statute is plain or ambiguous, we consider 'the language itself, the specific context in which the language is used, and *the broader context of the statute as a whole*.'. . . "Statutory language is ambiguous if it is *susceptible to more than one reasonable interpretation*." *Kaye v. Blue Bell Creameries, Inc. (In re BFW Liquidation, LLC)*, 899 F.3d 1178, 1188 (11th Cir. 2018) (emphasis added) (citations omitted).

As will be discussed more fully below, a plain reading of  Section 507(d)(4) of the Bankruptcy Code fully supports the Trustee's position that a payment on a § 503(b)(9) claim constitutes an "unavoidable transfer to or for the benefit of" the creditor receiving such payment within the meaning of the statute.  To hold otherwise would require the Court to insert the word "prepetition" into the statute before the word "transfer," or else revise the definition of the term

"transfer" under the Bankruptcy Code to specifically exclude payments on administrative expense claims.[4]   Moreover, to interpret Section 507(d)(4) in the manner urged by the Defendant would *not* render the statutory scheme of the Bankruptcy Code "coherent and consistent" but would result in the nonsensical result of allowing a supplier to the debtor to "double count" the value of the same goods delivered.

### 3.   The Former Chief Bankruptcy Judge of this District has Already Ruled on this Issue

The former Chief bankruptcy judge of this district addressed the very question at issue in this matter in a case with remarkably similar facts to those in this Adversary Proceeding. *See TI Acquisition, LLC v. Southern Polymer, Inc. (In re TI Acquisition, LLC)*, 429 B.R. 377 (Bankr. N.D. Ga. 2019) (Judge Diehl).   In *TI Acquisitions,* the debtor was a manufacturer of carpeting and textiles. *Id.*, at 378.     Prior to the debtor's bankruptcy, Southern Polymer, Inc. ("**Southern Polymer**"), a supplier of goods used in the debtor's manufacturing process, had received a number of payments within the ninety-days prior to the commencement of the debtor's bankruptcy case, thus giving rise to a potential preference action against Southern Polymer for the recovery of those payments. *Id.*   Southern Polymer had also supplied goods to the debtor within twenty days of the debtor's bankruptcy filing which had remained unpaid, thus giving rise to a claim under § 503(b)(9) for the value of those goods.   *Id.*   The debtor sued Southern Polymer in a preference action, and sought a ruling from the court that Southern Polymer could not use the value of the goods supplied within twenty days of the debtor's bankruptcy both as a "new value" defense to the preference claim and also as an administrative claim against the debtor's estate under section 503(b)(9) of the Bankruptcy Code. *Id*

---

[4] The definition of the term "transfer" in the Bankruptcy Code is discussed below.

Judge Diehl ruled in favor of the debtor and held that Southern Polymer could not double-count the value of the goods delivered within the twenty-day period as both a § 503(b)(9) claim and "new value" defense to a preference action. *Id*, at 385.  In reaching her decision Judge Diel first examined the analogous situation of whether a creditor that had asserted a valid reclamation claim could also recover under a 503(b)(9) claim. *Id.,* at 380-81.  To this end, Judge Diehl looked favorably on the reasoning of the District Court for the Middle District of Tennessee in the case of *In re Phoenix Rest. Group, Inc.*, 373 B.R. 541, 547-48 (M.D. Tenn. 2007).  In that case, the district court had reasoned that the creditor had essentially kept "strings" on the goods subject to its reclamation claim and that therefore those goods did not "enhance" the debtor.  For this reason, those goods should not also be counted as "new value" to the debtor to reduce the debtor's preference claim against the creditor.  Judge Diehl then held that claims under 503(b)(9) imposed similar "strings" to the goods delivered during the relevant period, and that such goods would not enhance the value of the debtor, particularly in instances (such as in the instant case) in which administrative claims would be paid in full. *TI Acquisition*, 429 B.R. at 381.  As the court concluded, "fully funded 503(b)(9) claims" should be treated "like reclamation claims," and not available as a new value defense to a preference claim, "because § 503(b)(9) claims deny the debtor and the debtor's estate the uninhibited use of new value."  *Id.* At 384.[5]

Judge Diehl then examined policy considerations behind the new value defense.  The first objective of the new value defense "is to encourage creditors to continue extending credit to financially troubled entities while discouraging a panic-stricken race to the courthouse."  *Id.*, at 384 (citations omitted).  Because a creditor would have no way of knowing whether or when a customer might file for bankruptcy, and therefore whether the creditor might have the right to

---

[5] As discussed below, Judge Diehl also drew a clear distinction between payment on a reclamation claim and payments on a "critical vendor" order and their application to a new value defense.  *Id.* at 584-85.

assert a § 503(b)(9) claim, "there is no difference in the incentive if the new value defense the creditor may have relied on is lost as a result of a § 503(b)(9) claim." *Id.*, at 385. Moreover, in instances in which § 503(b)(9) claims are paid in full, the creditor would not suffer any loss if its new value defense is denied as a result of the § 503(b)(9) claim. *Id.* Therefore, there would be no disincentives to creditors to continue supplying financially troubled entities if they could not double-count the value of the goods they deliver during the twenty days prior to a debtor's bankruptcy filing.

Judge Diehl found that the second policy consideration – "equal treatment of creditors" – weighed heavily in favor of denying new value credit for allowed and paid § 503(b)(9) claims. "Allowing BOTH new value credit and payment of the § 503(b)(9) claim elevates the claim of that creditor and results in double payment to that creditor." *Id.* The estate would then need to pay the administrative claim and would be "unable to recover a preference payment that otherwise be available for distribution to other creditors." *Id.* Thus, "it would be inequitable and contrary to the statute to allow the new value defense to be used when the creditor has been paid in full, out of the debtor's estate, for the new value shipments." *Id.*

#### 4. *TI Acquisition Remains Compelling, Persuasive and Applicable Law*

The Defendant attempts to distinguish the holding in *TI Acquisition* from the facts in this Adversary Proceeding and argues that this Court should not follow *TI Acquisition*. However, none of the Defendant's arguments are the least bit compelling. *See* Brief, at 13-14. The five arguments offered by the Defendant in this regard and the Trustee's responses are below.

*First*, the Defendant states that the *TI Acquisition* holding is not binding on this Court. While this is technically true, the *TI Acquisition* decision is certainly well-reasoned, persuasive authority that this Court can and should carefully consider.

*Second*, the Defendant claims that *TI Acquisition* opinion is "no longer good law" and should be "disregarded" following the Eleventh Circuit's decision in *In re BFW Liquidation, LLC*, 899 F.3d 1178 (11th Cir. 2018). But the holding in *BFW Liquidation* has virtually nothing to do with this Adversary Proceeding. It does not discuss *TI Acquisition*, and certainly does not overrule it. Nor does it discuss any other cases that examine the interplay of Section 503(b)(9) and Section 547(c)(4) In fact, nothing in the *BFW Liquidation* decision contradicts the position taken by the Trustee in this Adversary Proceeding. Accordingly, the Defendant's reliance on that decision is entirely misplaced.

The Defendant inexplicably claims that the Court's decision in *TI Acquisition* was "heavily influenced by what it perceived to be the Eleventh Circuit's 'remains unpaid' standard." Brief, at 13. But in rendering her decision Judge Diehl first noted that it was unclear whether the Eleventh Circuit had truly adopted the "remain unpaid" rule with regard to the new value defense (thus evidencing remarkable foresight with regard to the eventual decision in *BFW Liquidation*), but concluded that whichever rule the Eleventh Circuit ultimately adopted, payments to Section 503(b)(9) claimants would render the invoices covered by such claims ineligible for the new value defense, because "§ 503(b)(9) claims deny the debtor and the debtor's estate the uninhibited use of new value." *Id.* at 384. In short, the Eleventh Circuit's holding in *BFW Liquidation* in no way impacts Judge Diehl's decision in *TI Acquisition.*

*Third*, Defendant alleges that the *TI Acquisition* decision was "wrongly decided" because Judge Diehl had allegedly failed to do a "careful textual analysis" of Section 547(c)(4)(B) as the Eleventh Circuit had done in *BFW Liquidation* and, had she done so, she allegedly would have found that "the plain language of the statute limits the reference to 'transfers' to those that occur prior to the bankruptcy petition date." Brief, at 14. But the *BFW Liquidation* decision does not

limit the "transfer" referenced in Section 547(c)(4)(B) to *prepetition* payments of new value. The operative language of that decision was that "[b]y its plain terms, then, the statute only excludes 'paid' new value that is paid for with 'an otherwise unavoidable transfer.'" *BFW Liquidation*, 899 F.3d at 1189 (citations omitted). Nowhere in such holding is anything suggesting that the transfer that pays for the new value had to have occurred prepetition. *See also Circuit City Stores, Inc. v. Mitsubishi Digital Electronics America, Inc. (In re Circuit City Stores, Inc.)*, No. 10-03068-KRH, 2010 Bankr. LEXIS 4398 (Bankr. E.D. Va. Dec. 1, 2010)("**Circuit City I**") (concluding that a debtor's post-petition payment of a creditor's § 503(b)(9) claim "is an 'otherwise unavoidable transfer' that Section 547(c)(4)(B) of the Bankruptcy Code negates for qualification as new value.")

Moreover, the *BFW Liquidation* decision does not hold that the "otherwise unavoidable" phrase found in Section 547(c)(4)(B) means that the transfer paying for the new value must be unavoidable due to another of the subsection (c) defenses found in Section 547 in order for the goods or services being paid by such transfer to fail to qualify as new value. The Eleventh Circuit merely held that "[w]e read the phrase 'otherwise unavoidable transfer' in § 547(c)(4)(B) as referring to transfers that are unavoidable for reasons *other than § 547(c)(4)'s subsequent-new-value defense*." *Id.* at 1198 (emphasis added). Certainly, a transfer unavoidable due to another subsection (c) defense would qualify as "otherwise unavoidable", but neither the language of the statute nor the Eleventh Circuit's holding limit that phrase to *only* those other subsection (c) defenses. Thus, there is no basis for Defendant's allegation that *TI Acquistion* was "wrongly decided."

*Fourth*, the Defendant asserts that *TI Acquisition* had "facts dramatically different than those in this case," and therefore "easily distinguishable" from the relevant facts in this Adversary

Proceeding.  Brief, at 14.  But the "dramatically" different facts between the two cases are just inconsequential matters of timing.  *TI Acquisition* was a decision in an adversary proceeding brought in the Chapter 11 case of *In re TI Acquisition*, Case No. 08-42370 (the "**TI Acquisition Bankruptcy Case**") that was then pending in this district.  Both the TI Acquisition Bankruptcy Case and this Bankruptcy Case each resulted in confirmed plans of liquidation[6] which established trusts to receive, hold and liquidate the estate's assets and ultimately distribute proceeds of those assets to creditors.  *See generally* TI Acquisition Plan, Art. IV; Plan, Art. VI.  Both plans provided for payment in full of all allowed administrative expense claims.  TI Acquisition Plan, § 2.12; Plan, § 2.02.  But the Defendant argues that because *TI Acquisition* was decided *before* the plan in that Chapter 11 case was confirmed, and the instant Adversary Proceeding was not commenced until *after* the Plan in this Bankruptcy Case was confirmed, this fact somehow renders the *TI Acquisition* case inapplicable to this Adversary Proceeding.

The Defendant appears to allege that because the debtor in the TI Acquisition Bankruptcy Case was still in possession of its assets at the time the *TI Acquisition* opinion was issued, the *debtor* in that case could have paid the Section 503(b)(9) claim at issue, but because the Debtor in the instant Bankruptcy Case had previously transferred all of its assets to the Trust, the *Debtor* will be incapable of paying the 503(b)(9) Claim of Defendant.  Brief, at 14.   Thus, argues the Defendant, the Debtor will be unable to make the "unavoidable transfer" necessary to render the new value defense inapplicable.  But this argument fails for a number of reasons.

---

[6]   The confirmed plan of liquidation in the TI Acquisition Bankruptcy Case (the "**TI Acquisition Plan**") was filed as Docket No. 430 in the TI Acquisition Bankruptcy Case and confirmed by order entered September 3, 2010 at Docket No. 498.  The TI Acquisition Plan and the confirmation order are available for review on the Court's ECF system.

What the Defendant fails to grasp is that any payment made on the 503(b)(9) Claim would ultimately come from the Debtor.  Under the Plan, the Debtor transferred all of its assets to the Trust "for the benefit" of its creditors, including the Defendant.  *See* Plan, § 6.03 (providing that the Debtors transfer all of their assets to the Trust); Plan, Schedule 6.02 (Liquidating Trust Agreement), § 9.1 (providing that the Trustee will hold such assets "for the benefit" of the beneficiaries of the Trust, which consist of Beaulieu's creditors).  The Trust is essentially a pass-through vessel through which Beaulieu's assets flow, and the Trustee is charged with collecting and, ultimately, distributing those assets to the holders of allowed claims.  *See*, Plan § 6.06.

Moreover, pursuant to the Plan, "[f]or federal income tax purposes, the transfer of the Property to the Liquidating Trust will be deemed to be a transfer to the Holders of Allowed Claims (who are the Liquidating Trust Beneficiaries), followed by a deemed transfer by such Liquidating Trust Beneficiaries to the Liquidating Trust."  Plan, § 6.03.  And, pursuant to the Liquidating Trust Agreement, "the Debtors and the Liquidating Trustee hereby establish the Liquidating Trust on behalf of the Liquidating Trust Beneficiaries [the creditors] to be treated as the grantors and deemed owners of the Liquidating Trust Assets . . . ."  Plan, Schedule 6.02 (Liquidating Trust Agreement), § 9.1.   Thus, when the Trustee pays the 503(b)(9) Claim, the payment on that claim would first have either been (a) an "unavoidable transfer" from the Debtor to the Trust for the benefit of Beaulieu's creditors, including the Defendant, and then a further "unavoidable transfer" directly to Defendant, or (b) a deemed transfer directly to the Defendant and then to the Trust for federal income tax purposes.

Further, the Trustee always has the ability to cause the Debtor to pay the Defendant directly, if that were truly an issue.  Under the Plan, the Debtor remains in existence as a legal entity, and the Trustee has "the sole right and authority to control and direct the activities" of the

Debtor.  Plan, § 6.17.  Among other things, the Trustee holds an "irrevocable power of attorney" over the Debtor and all of its assets.  Plan, § 6.13.  The Trustee has more than sufficient funds in the Trust to fully satisfy the 503(b)(9) Claim.  Jacoby Declaration, ¶ 11.  Accordingly, the Trustee could easily set up a bank account in the name of the Debtor, and then cause the Debtor to make an "unavoidable transfer" of any funds to the Defendant necessary to satisfy the 503(b)(9) Claim.

Finally, the absurdity of the Defendant's argument is shown by how easily a debtor could game the system by simply making payments on any claims allowable under Section 503(b)(9) of the Bankruptcy Code the day before the debtor's liquidating plan became effective, or by explicitly establishing under the plan a bank account in the name of the debtor for the sole purposes of paying allowed 503(b)(9) claims.  Such gamesmanship would serve no legitimate purpose and would not advance any goals of Chapter 11.

*Fifth,* the Debtor alleges that the Third Circuit's decision in *In re Friedman's Inc.*, 738 F.3d 547 (3d Cir. 2013), is applicable to the instant facts of this case.  It is not.  *Friedman's* involved the payment of prepetition obligations owed to a personnel staffing company pursuant to a "wage order" issued by the bankruptcy court upon the request of the debtor.  738 F.3d at 549.  The liquidating trustee subsequently sued the staffing company to avoid certain alleged preference payments, and the staffing company asserted a "new value" defense, which included the value of the prepetition services for which it had been paid under the wage order.  *Id.*  The Third Circuit ultimately held that the payments under the wage order could not be used to reduce the staffing company's new value defense to the preference action.  *Id.,* at 562.

As the Defendant admits," the *Friedman's* decision is not binding on this Court."  Brief, at 14.  Moreover, the post-petition payment in *Friedman's* was made pursuant to a discretionary "wage order," which is very similar to "critical vendor" orders that Judge Diehl had discussed in

16

*TI Acquisition* in which she distinguished the payment on such orders from payment on § 503(b)(9) claims. *TI Acquisition*, 429 B.R. at 382. As Judge Diehl found, "[p]ayment pursuant to a critical vendor order differs markedly from the statutory priority afforded to § 503(b)(9) claims." *Id.* In addition to being discretionary, a debtor has a wide latitude to negotiate the provisions of the order and the subsequent obligations of the parties. *Id.* In contrast, Section 503(b)(9) *mandates* administrative expense status for claims arising under its provisions. Thus, payment on a discretionary order providing for a payment to a staffing company not have the same application to a new value defense as would payment on a Section 503(b)(9) claim.

Notably, the one court that has considered *Friedman* in the context of determining whether payment on a § 503(b)(9) claim would preclude a creditor from asserting a new value defense to a preference claim squarely supports the Trustee's position. *See Siegel v. Sony Elec., Inc. (In re Circuit City Stores, Inc.)*, 515 B.R. 302, 313-14 (Bankr. E.D. Va. 2014) ("**Circuit City II**"). As an initial matter, the court in that case found that "the Third Circuit clearly indicated that it did not intend for its decision to extend to § 503(b)(9) claims." *Id.*, at 314. To hold otherwise would result in the nonsensical situation in which a creditor "would be permitted a double recovery based on the same goods that underlie its single claim" and "result in the inequitable treatment of creditors, as the Trustee would be required to pay the administrative claim while simultaneously not being permitted to challenge potentially avoidable preferential transfers." *Id.*

For all of the reasons discussed above, the Court should follow Judge Diehl's decision in *TI Acquisition* ad reject the Defendant's assertion that that decision is "inapplicable" to this matter.

### 5. A Payment on the 503(b)(9) Claim is a "Transfer"

The Defendant also argues that a payment on a Section 503(b)(9) claim constitutes a "distribution," which it alleges cannot constitute a "transfer" for purposes of Section 507(c)(4)(B).

Brief, at 9-11.  However, this argument was implicitly rejected by Judge Diehl in *TI Acquisition* when she held that a creditor who is paid in full on a Section 503(b)(9) claim is not entitled to a new value defense.  *TI Acquisition*, 429 B.R. at 385.  Moreover, a plain reading of the definitions set out in the Bankruptcy Code reveals that there is no basis to conclude that a payment on a 503(b)(9) claim, whether considered a "distribution" or something else, would not constitute a "transfer" within the meaning of the statute.

The term "distribution" is not defined in the Bankruptcy Code.  However, the term "transfer" *is* defined and includes "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with (i) property; or (ii) with an interest in property."  11 U.S.C. § 101(54).  *See also In re Conner*, 733 F.2d 1560 (11th Cir. 1984).  Nowhere in that expansive definition is there any indication that the term "transfer" cannot include a distribution or other payment made to a creditor, whether by a debtor or a trustee, regardless of whether that payment occurs before or after the petition date.  Further, the legislative history makes clear that Congress intended the definition of the term "transfer" to be "as broad as possible" to include any surrender of "possession, custody or control" of property.  Senate Report No. 95-989, 95th Cong. 2d Sess. 26-27 (1978).  Clearly, the payment on a Section 503(b)(9) claim is the surrender of "possession, custody or control" of the funds used to make that payment.

In addition, the Plan itself distinguishes between "Distributions" to be made to general unsecured creditors and "payments" made to other creditors.  Only holders of unsecured claims placed in Class 6 or Class 7 under the Plan will ultimately receive Distributions.  Plan, §§ 5.08 and 5.09.  In contrast, holders of administrative expense claims (and other secured claims and priority claims) will be "paid in full, in cash."  Plan, § 2.02.  Thus, the Defendant's argument that it will

receive a "distribution" under the Plan that would not constitute a "transfer" is neither legally nor factually accurate.

### 6. There is a Fundamental Difference between 503(b)(9) Claims and General Unsecured Claims

Defendant argues that "for purposes of § 547, there is really no difference between § 503(b)(9) claims and general unsecured claims for goods delivered in the 90-day period before a bankruptcy filing." Brief, at 11. But there is a huge difference. To understand why, one needs only to look at the distribution scheme under the Bankruptcy Code and the realities of liquidating Chapter 11 cases. Allowed administrative claims are intended to be paid in full, as will happen in this Chapter 11 case. General unsecured claims, on the other hand, are typically paid only on cents on the dollar, as will most likely occur in this Chapter 11 case. In cases where substantially all of a debtor's operating assets have been sold (such as in this Chapter 11 case), a liquidating trustee is charged with, among other things, recovering as much funds as possible through avoidance actions and other means to put in a "pot" to be held by the trustee for the benefit of the estate's creditors, and then ultimately distributing any funds remaining in that "pot" to the debtor's prepetition creditors *after* administrative expenses have been paid. More often than not, that pot is close to being empty after administrative expenses are paid.

Entities that did business with the debtor before its bankruptcy are given statutory defenses to preference actions – including "new value" and "ordinary course of business" – to mitigate the unfairness of having to return money they had received in the course of supplying the debtor while it was experiencing financial difficulties. Moreover, they will receive general unsecured claims for any funds they must return to the debtor resulting from preference actions. But to allow a holder of a § 503(b)(9) claim to receive full payment on an administrative claim while at the same time asserting a new value defense in the same amount would enable that creditor to double-dip

19

on the same claim – both by sucking funds out of the "pot" when its administrative expense claim is paid in full, and by simultaneously reducing the size of the "pot" by asserting a defense to a preference action in the same amount for the same underlying transaction.  Thus, there is a clear difference between the treatment afforded a Section 503(b)(9) Claim for deliveries made within the 20-day period before bankruptcy and a general unsecured claim arising from deliveries made outside the 20-day window.

### 7.  *Policy Reasons Support the Debtor's Position*

The Defendant argues that "policy concerns strongly support" its position.  But Judge Diehl very clearly set out the policy justifications for her decision in *TI Acquisition,* in which she concluded:

> Denying a creditor the new value defense when the creditor's § 503(b)(9) claim is paid in full and is for the same goods for which the creditor seeks new value is the best way to foster the policies behind the new value defense.  The new value defense may encourage the creditor to continue extending credit to a financially troubled entity and the creditor is rewarded with the full payment of its claims. Secondly, providing a creditor with full payment of its § 503(b)(9) administrative claim and allowing the estate to recover preference payments in full is the best way to promote the equal treatment of creditors because it gives the § 503(b)(9) credit full value for its claim, but does so one time.

*TI Acquisition*, 429 B.R. at 385-86. *See also Circuit City II*, 515 B.R. at 314 (allowing a "double recovery" on a 503(b)(9) claim would "result in the inequitable treatment of creditors, as the Trustee would be required to pay the administrative claim while simultaneously not being permitted to challenge potentially avoidable preferential transfers.")  Accordingly, as the policy considerations justifying the Trustee's position in this matter have been clearly explained by Judge Diehl, there is no need to elaborate further on those policy considerations in this memorandum.

### 8.  Conclusion as to Counterclaim I

For all of the foregoing reasons, Defendant's request for summary judgment on Counterclaim Count I should be denied.

### B.     It is Premature to Grant the Defendant Summary Judgment on Counts III and IV of the Complaint.

In general, the Trustee does not dispute Defendant's contentions regarding the Trustee's objections to Claim No. 1413 and the 503(b)(9) Claim.  The substantially duplicative proof of claim ("**Claim No. 1062**") filed by Coface Insurance Company ("**Coface**") on behalf of "Fabric Sources, Inc." has been withdrawn and, according to the Simuro Declaration, the Defendant had not authorized Coface to file a proof of claim on the Defendant's behalf.  Simuro Declaration, ¶ 19.  Moreover, also according to the Simuro Declaration, Fabric Sources, Inc. was simply a former d/b/a of the Defendant.  Simuro Declaration, ¶ 17.  Accordingly, the Trustee agrees that Claim No. 1413 appears to be a valid unsecured claim and that the 503(b)(9) Claim appears to be a valid administrative expense claim.

However, it is still premature to deny the Trustee's objection to those claims altogether.  In Courts III and IV of the Complaint, the Trustee expressly reserved the right to object further to Claim No. 1413 and the 503(b)(9) Claim "on any additional factual or legal grounds" including any further information may be discovered through discovery.  Complaint, at 9-10.  Discovery has not closed in the Adversary Proceeding and, although the claims appear to be properly calculated, it is possible that discovery might reveal a further basis to object to the amounts of those claims. The Trustee and the Defendant have been working in good faith the submit a stipulation to a number of facts that might substantially limit discovery in this Adversary Proceeding, including, potentially, the allowable amounts of Claim No. 1413 and the 503(b)(9) Claim.  At that point, the

Trustee may withdraw its objection to those claims altogether.  In the interim, however, it is premature for the objections to be summarily denied in full.

### C.      The Trustee withdraws Count VIII of the Complaint as to the 503(b)(9) Claim.

The Trustee agrees that the clear weight of authority holds that Section 502(d) does not apply to disallow administrative expense claims.  Accordingly, the Trustee withdraws Count VIII as a basis for objecting to the 503(b)(9) Claim.  However, the Defendant does not contend that Section 502(d) does not apply with respect to general unsecured claims.  Therefore, Count VIII will remain in full force and effect with respect to the remaining Unsecured Claim (Claim No.1413).

### III. <u>CONCLUSION</u>

WHEREFORE, the Trustee prays that this Court:

1.      deny the relief requested in Defendant's Motion as to Counterclaim Count I;

2.      deny the relief requested in Defendant's Motion as to Complaint Count III as to the amount of Claim No. 1413 on the ground that that a complete denial of the objection to the claim asserted in Count II is premature;

3.      deny the relief requested in Defendant's Motion as to Complaint Count IV as to the amount of the 503(b)(9) Claim on the ground that that a complete denial of the objection to the claim asserted in Count II is premature;

4.      allow the relief requested by the Defendant as to Counterclaim Count II and Complaint Count VIII as to the 503(b)(9) Claim only; and

5.      grant such other relief as is just.

**(Signature Appears On Following Page)**

This 10th day of January, 2020.

SCROGGINS & WILLIAMSON, P.C.

By:  ___/s/ J. Hayden Kepner, Jr._____

4401 Northside Parkway
Suite 450
Atlanta, Georgia 30327
T: (404) 893-3880
F: (404) 893-3886
E: rwilliamson@swlawfirm.com
    hkepner@swlawfirm.com

J. ROBERT WILLIAMSON
Georgia Bar No. 765214
J. HAYDEN KEPNER, JR.
Georgia Bar No. 416616

*Counsel for the Liquidating Trustee*

**CERTIFICATE OF SERVICE**

This is to certify that on the 10th day of January 2020, I caused a copy of the foregoing **RESPONSE IN OPPOSITION TO DEFENDANT FABRIC SOURCES INTERNATIONAL, LLC'S MOTION FOR PARTICAL SUMMARY JUDMENT** to be served upon counsel and/or parties of interest electronically through the Court's CM/ECF system to those shown on the Notice of Electronic Filing receipt issued by the Clerk of the Court, and by First Class U.S. mail, addressed as follows:

Christopher Collins
Caleb T. Holzaepfel
Husch Blackwell LLP
736 Georgia Avenue
Suite 300
Chattanooga, TN  37402

Michael D. Fielding
Husch Blackwell LLP
4801 Main Street
Suite 1000
Kansas City, MO  64112

This 10th day of January, 2020.

SCROGGINS & WILLIAMSON, P.C.


/s/ J. Hayden Kepner, Jr.
J. HAYDEN KEPNER, JR.
Georgia Bar No. 416616

4401 Northside Parkway
Suite 450
Atlanta, GA  30327
T:  (404) 893-3880
F:  (404) 893-3886
E:  hkepner@swlawfirm.com