**IT IS ORDERED as set forth below:**

**Date: March 20, 2020**

_____

**Barbara Ellis-Monro
U.S. Bankruptcy Court Judge**

_____

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF GEORGIA
## ROME DIVISION

| | |
|---|---|
| IN RE:<br><br>BEAULIEU GROUP, LLC AND BEAULIEU TRUCKING, LLC,<br><br>Debtors. | CASE NO. 17-41677-BEM<br><br><br>CHAPTER 11 |
| PMCM 2, LLC, as the Liquidating Trustee for the Beaulieu Liquidating Trust,<br><br>    Plaintiff,<br><br>v.<br><br>FABRIC SOURCES, INC. and FABRIC SOURCES INTERNATIONAL LLC,<br><br>    Defendants. | ADVERSARY PROCEEDING NO. 19-4036-BEM |

### O R D E R

On June 25, 2019, Plaintiff filed a *Complaint (I) Objecting to Claims and (II)*

*Seeking to Avoid and Recover Transfers*. [Doc. 1]. The Complaint consisted of eight counts, as

follows: (I) Objection to Reclamation Demand; (II) Objection to Proof of Claim No. 1062; (III)

Objection to Proof of Claim No. 1413; (IV) Objection to § 503(b)(9) Claim[1]; (V) Avoidance of

Preferential Transfers; (VI) Recovery of Avoided Transfers Pursuant to 11 U.S.C. § 550; (VII)

Turnover of Property of the Estate; and (VIII) Disallowance of Claims. Defendant filed an Answer

and Counterclaims on July 26, 2019. [Doc. 4]. The two counterclaims seek: (I) Declaratory

Judgment that Defendant's use of the new value defense under 11 U.S.C. § 547(c)(4) does not

preclude it from a distribution for its administrative expense or its general unsecured claim on

account of the same new value; and (II) Declaratory Judgment that Plaintiff cannot use 11 U.S.C.

§ 502(d) to disallow an administrative expense claim. The first two counts of the Complaint were

dismissed by stipulation. [Doc. 21]. Defendant thereafter filed a *Motion for Partial Summary

Judgment* as to Counts III, IV, and VIII of the Complaint to the extent it applies to Defendant's §

503(b)(9) Claim, and the two counterclaims (the "Motion"). [Doc. 22]. Plaintiff filed a response

to the Motion. [Doc. 31]. In its Response, Plaintiff withdrew Count VIII of the Complaint as to the

§ 503(b)(9) Claim, but continues to assert Count VIII as to Defendant's Claim No. 1413. [Id. at

22]. Defendant filed a Reply [Doc. 34], and the Motion is now ripe for determination. The Court

has jurisdiction pursuant to 28 U.S.C. § 157(b)(2)(B), (F).

**I. Summary Judgment Standard**

       Summary judgment is appropriate when "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter

of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); Fed. R. Civ.

P. 56(a); Fed. R. Bankr. P. 7056. The Court will only grant summary judgment when the evidence,

---

[1] Due to a scrivner's error, Count IV was mistitled as "Objection to POC No. 1413." [Doc. 32 at 3]

viewed in the light most favorable to the nonmoving party shows no genuine dispute of material fact. *Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir. 1986). A fact is material if it "might affect the outcome of the suit under the governing law ...." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). A dispute of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party has the burden of establishing its entitlement to summary judgment. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). The moving party must identify the pleadings, discovery materials, or affidavits that show the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S. Ct. at 2553. Once this burden is met, the nonmoving party cannot merely rely on allegations or denials in its own pleadings. *Hairston v. Gainesville Sun Publ'g. Co.*, 9 F.3d 913, 918 (11th Cir. 1993). Rather, the nonmoving party must present specific facts supported by evidence that demonstrate there is a genuine material dispute. *Id.* When the material facts are not in dispute, the role of the Court is to determine whether the law supports a judgment in favor of the moving party. *Anderson*, 477 U.S. at 250-51, 106 S. Ct. at 2511.

When the moving party has the burden of proof at trial, that party must affirmatively show the absence of a genuine issue of material fact: it must support its motion "with credible evidence ... that would entitle it to a directed verdict if not controverted at trial." *Celotex*, 477 U.S. at 331, 106 S. Ct. at 2557 (Brennan, J., dissenting). Upon making this showing, the burden shifts to the nonmoving party, who must produce "significant probative evidence demonstrating the existence of a triable issue of fact" to avoid summary judgment. *American Viking Contractors, Inc. v. Scribner Equip. Co., Inc.*, 745 F.2d 1365, 1369 (11th Cir. 1984). When considering summary judgment, the Court "'must not resolve factual disputes by weighing conflicting

evidence[.]'" *Tippens*, 805 F.2d at 953 (quoting *Lane v. Celotex Corp.*, 782 F.2d 1526, 1528 (11th Cir. 1986)).

## II. Undisputed Material Facts

On March 12, 2020, the parties filed a *Joint Stipulation of Facts* (the "Stipulation" or "Stip.") [Doc 38] that stated: "This Joint Stipulation of Facts (including any and all exhibits thereto) shall be deemed admitted into evidence for trial or any other pleading which may be filed in this matter (including, but not limited to, any motion for summary judgment)." [Stip. ¶ 39]. Accordingly, the Court will adopt the Stipulation as the undisputed material facts for purposes of Defendant's Motion.

Defendant is a Georgia limited liability company with its principal place of business in Dalton, Georgia. [Stip. ¶ 1]. It is a full-service provider of nonwoven, composite, specialty, and woven products. [Id. ¶ 6]. Plaintiff is the Liquidating Trustee for the Beaulieu Liquidating Trust (the "Trust"). [Id. ¶ 2]. The Trust is the transferee of certain assets and claims formerly held by the debtor, Beaulieu Group, LLC (the "Debtor"). [Id.].

Debtor and its affiliated entities filed voluntary Chapter 11 petitions on July 16, 2017. [Id.]. For quite some time before Debtor's bankruptcy filing, Defendant sold primary and secondary backing to Debtor. [Id. ¶ 7]. A true and accurate Payment History between Defendant and Debtor covering the period from May 2014 to the petition date is attached to the Stipulation as Exhibit A (the "Payment History") and is incorporated herein. [Id. ¶ 8]. The Payment History provides the number for each invoice, the date of each invoice, the amount of each invoice, the date on which each invoice was paid, and the number or days between the invoice date and the date the invoice was paid. [Id. ¶ 9] The Payment History identifies those invoices that were not paid and identifies the value of goods that were sold by Defendant to Debtor. [Id.]. All of the goods

4

were sold on open credit terms in the normal course of business between the parties. [Id. ¶ 10]. Debtor purchased the goods for use in its normal business operations. [Id.].

The 90th day before Debtor's bankruptcy filing was April 17, 2017. [Id. ¶ 11]. April 17, 2017 through July 15, 2017 is defined as the "Preference Period." [Id.]. The period of time from May 2014 (the beginning of Payment History) to April 17, 2017 is defined as the "Pre-preference Period." [Id.].

Debtor's payments for the goods during both the Pre-preference Period and the Preference Period were for debts that Debtor incurred with Defendant in the ordinary course of business or financial affairs of the parties. [Id. ¶ 12]. Plaintiff has not asserted, and agrees not to assert, that Defendant made any undue or unusual demands during either the Pre-preference Period or the Preference Period to obtain payment from Debtor for any outstanding monies owed for the goods it had delivered to Debtor. [Id. ¶ 13]. Similarly, Plaintiff has not asserted, and agrees not to assert, that Debtor made any payments to Defendant during either the Pre-preference Period or the Preference Period with the intention of deliberately preferring Defendant over other creditors of Debtor. [Id. ¶ 14].

During both the Pre-preference and Preference periods, there were goods sold by Defendant to Debtor for which Defendant has never received payment. [Id. ¶ 15]. More specifically, beginning on March 21, 2017 and continuing through July 14, 2017, Defendant sold and delivered to Debtor $1,333,253.07 of goods for which Defendant never received payment (the "Goods"). [Id.] The Goods are set forth on the Payment History. [Id.]

During the Preference Period Defendant sold and delivered to Debtor $1,088,942.67 worth of Goods. [Id. ¶ 16]. Of that amount, $160,088.92 of those Goods were delivered within 20 days of Debtor's bankruptcy petition date. [Id.]. All the Goods that were sold

5

by Defendant to Debtor were goods that were typically purchased by Debtor in its ordinary course of business. [Id. ¶ 17]. Those Goods sold during the 20-day period prior to Debtor's bankruptcy filing would constitute "goods" under 11 U.S.C. § 503(b)(9) if it were determined that § 503(b)(9) applies in this proceeding. [Id. ¶ 18]. The Goods that Defendant delivered to Debtor in the Preference Period were sold on open payment terms and were not secured by an otherwise unavoidable security interest. [Id. ¶ 19]. Defendant never had a security interest in any of the Goods. [Id.]

Following its bankruptcy filing, Debtor operated for a period of time as a debtor-in-possession. [Id. ¶ 20]. While operating as a debtor-in-possession, Debtor did not make any distributions to Defendant on account of the Goods that Defendant had delivered to Debtor prior to Debtor's bankruptcy petition. [Id. ¶ 21]. Debtor remains an entity in legal compliance with its filing obligations with the Georgia Secretary of State's Office. [Id. ¶ 22].

To date, the Trust has not made any distributions on either Defendant's timely filed proof of claim in the amount of $1,173,152.49 or Defendant's timely filed § 503(b)(9) administrative claim in the amount of $160,088.92. [Id. ¶ 23].

Following the Petition Date, Debtor made various pre-payments in the amount of $25,463.51 (the "Pre-Payments") to Defendant for goods that were never delivered to Debtor. [Id. ¶ 24]. The Pre-Payments were not applied to any invoices. [Id.]. Defendant continues to hold the Pre-Payments. [Id.].

On November 1, 2017, the Court entered its Order (A) Approving Asset Purchase Agreement And Authorizing the Sale of Assets of the Debtors Outside the Ordinary Course of Business, (B) Authorizing the Sale of Assets Free And Clear of All Liens, Claims, Encumbrances And Interests, (C) Authorizing the Assumption And Sale And Assignment Of Certain Executory

6

Contracts And Unexpired Leases And Establishing Cure Costs In Connection Therewith, And (D) Granting Related Relief granting the Sale Motion authorizing the Debtors to sell substantially all their personal property assets to Engineered Floors, LLC and certain real property to Pentz Street Holdings, LLC (the "Buyers"). [Id. ¶ 25]. The sale of substantially all Debtors' assets to the Buyers closed on November 6, 2017. [Id. ¶ 26].

On March 14, 2018, Debtor, other debtors, and the Official Committee of Unsecured Creditors filed a First Amended Joint Plan of Liquidation (the "Plan") in the Bankruptcy Case. [Id. ¶ 27]. The Plan created the Trust, into which all the assets of Debtor and its affiliated debtors were transferred on the Plan's effective date. [Id. ¶ 28]. On May 2, 2018, this Court entered its Order Confirming First Amended Joint Plan of Liquidation Proposed by Debtors and Official Committee of Unsecured Creditors (the "Confirmation Order"). [Id. ¶ 29]. The Plan became effective on June 4, 2018. [Id. ¶ 30]. Pursuant to the terms of the Plan, on the effective date, all the assets of Debtor, including all causes of action belonging to Debtor, were transferred to the Trust. [Id. ¶ 31].

**III. Analysis**

### A. Count III: Objection to Proof of Claim No. 1413

Count III of the Complaint objects to Claim No. 1413 as duplicative of proof of Claim No. 1062 and alleges that Claim No. 1413 does not adequately establish which entity is the actual creditor on the claim. Claim No. 1062 was filed by Coface North America Insurance Company ("Coface") in the amount of $1,333,253.07 and identified the creditor as Fabric Sources, Inc. [Complaint, Ex. B]. Claim No. 1413 was filed by Defendant, Fabric Sources International, LLC. [Doc. 22, Ex. 1]. The Complaint alleges that some attachments to Claim No. 1413 appear to indicate that amounts due on the claim are owed to Fabric Sources, Inc. To the extent any amount

in Claim No. 1413 is owed to Fabric Sources, Inc., the claim is invalid because no such entity appears to exist or be authorized to conduct business in Georgia. Plaintiff also reserved its right to further object to Claim No. 1413.

Defendant seeks summary judgment on Count III on the grounds that the Complaint fails to state a colorable challenge to Claim No. 1413. Defendant acknowledges that Fabric Sources, Inc. is a former d/b/a of Defendant. However, Defendant attached supporting documents to Claim No. 1413 consisting of transaction detail invoice reports with the invoice number, date, outstanding balance, and days outstanding. The reports made no reference to Fabric Sources, Inc. In addition, Debtor scheduled Defendant as a creditor, not Fabric Sources, Inc. Furthermore, Defendant did not file Claim No. 1062 and did not authorize Coface to file Claim No. 1062. Coface withdrew Claim No. 1062 on August 6, 2018 and has not filed any other claim.

A proof of claim executed and filed in accordance with the Bankruptcy Rules is prima facie valid. Fed. R. Bankr. P. 3001(f). The burden is on the objecting party to overcome the prima facie validity of the claim. If the objecting party succeeds, the burden of proof shifts to the claimant to prove its claim by a preponderance of the evidence. *In re International BioChemical Inds., Inc.*, 521 B.R. 395, 398 (Bankr. N.D. Ga. 2014) (Ellis-Monro, J.) (citing 4 Collier on Bankruptcy ¶ 502.02[3][f] (16th ed.)).

Plaintiff does not dispute Defendant's assertions as to POC No. 1413 but argues that summary judgment for Defendant is premature. Plaintiff agrees POC No. 1413 appears to be a valid unsecured claim. However, in the Complaint, Plaintiff expressly reserved the right to object further to the claim on any additional factual or legal grounds. Discovery has not closed in this proceeding. Plaintiff contends that although the claim appears to be properly calculated, it is possible discovery might reveal a further basis to object to the amount of the claim.

Defendant argues that Plaintiff's response is unacceptable pursuant to BLR N.D. Ga. 7056-1(a)(2), which provides: "The response [to the moving party's statement of material facts] that a party has insufficient knowledge to admit or deny is not an acceptable response unless the party has complied with the provisions of Rule 56(d) of the Federal Rules of Civil Procedure." Rule 56(d) provides: "If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Rule 56(b) states that "a party may file a motion for summary judgment at *any time* until 30 days after the close of all discovery" unless a local rule or court order provides otherwise. Fed. R. Civ. P. 56(b) (emphasis added). BLR 7056-1(b) provides that "Motions for summary judgment must be filed as soon as possible, but, unless the Bankruptcy Court orders otherwise, not later than twenty-eight days after the close of discovery." In this proceeding, the Court entered an order giving the parties 60 days after the close of discovery to file dispositive motions. [Docs. 14, 19]. Regardless of the deadline, the parties are entitled to "adequate time for discovery...." prior to entry of summary judgment. *Celotex*, 477 U.S. at 322, 106 S. Ct. at 2552; *Florida Power & Light Co. v. Allis Chalmers Corp.*, 893 F.2d 1313, 1316 (11th Cir. 1990). "[T]here may be circumstances in which a very early motion may be deemed premature because the issues need further development. ... [I]t is within the trial court's discretion to deny a motion for summary judgment without prejudice to its being renewed at a later time[.]" Federal Practice and Procedure (Wright & Miller) § 2718 (4th ed.). But, the potential problem of premature motions for summary judgment "can be adequately dealt with under Rule 56(f)[.]"[2] *Celotex*, 477 U.S. at 326, 106 S. Ct. at 2554. The Eleventh Circuit has stated that

---

[2] Rule 56(f) is the predecessor to Rule 56(d). Fed. R. Civ. P. 56, advisory committee's note to 2010 amendment.

> [i]n seeking the protection of Rule 56(d) the non-movant must show
> that "postponement of a ruling on the motion will enable [it], by
> discovery or other means, to rebut the movant's showing of the
> absence of a genuine issue of fact. ... [*V]ague assertions that
> additional discovery will produce needed, but unspecified facts" fail
> to meet this burden.*

*Smedley v. Deutsche Bank Trust Co. Am.*, 676 F. App'x 860, 861-62 (11th Cir. 2017) (emphasis

added) (quoting *Florida Power & Light*, 893 F.2d at 1316).

With respect to the adequacy of discovery time, Defendant filed Claim No. 1413

with supporting documentation on November 8, 2017. Plaintiff filed its Complaint on June 25,

2019, and Defendant filed its answer and counterclaims on July 26, 2019. The parties filed a report

of Rule 26(f) conference on September 24, 2019, in which Defendant stated they could not agree

to a discovery plan. [Doc. 14 ¶ 2]. After a status conference, on October 23, 2019, the Court entered

a scheduling order that approved 180 days for discovery. [Doc. 19 and Doc. 14 Ex. A]. The Motion

for Summary Judgment was filed on November 20, 2019. On January 8, 2020, the Court entered

a consent order, extending the time for discovery through May 1, 2020. [Doc. 30]. While

Defendant has requested discovery from Plaintiff [Doc. 27], nothing on the docket shows that

Plaintiff has requested any discovery from Defendant. Given that Claim No. 1413 was filed on

November 8, 2017 with supporting documentation, and Plaintiff is in control of the Debtors' books

and records, the Court concludes Plaintiff has had adequate time for discovery or to present

"specified reasons it cannot present facts essential to justify its opposition" to the Motion.

Regarding the applicability of Rule 56(d), Plaintiff did not file a motion under that

Rule, but Plaintiff attached the Jacoby Declaration to its response to Defendant's statement of

material facts. [Doc. 31 Ex. 1, hereinafter "Jacoby Declaration"]. With respect to Claim No. 1413,

the Declaration states:

> Although Claim No. 1413 appears to assert a legitimate general
> unsecured claim against the Debtors' estates, and appears to be
> consistent with the Debtors' books and records and other documents
> I have reviewed, I understand that discovery in this Adversary
> Proceeding has not yet concluded and it is possible that there are
> defenses or disputes as to the allowable amount of the claim that
> have not yet been determined.

[Jacoby Declaration ¶ 5]. As stated by the Eleventh Circuit, these sort of vague assertions of the need for additional discovery do not support the protection of Rule 56(d). Plaintiff does not dispute the validity or accuracy of any of the documentation accompanying Claim No. 1413. Nor does Plaintiff point to any records of the Debtors to show the amount of Claim No. 1413 is or could be incorrect.

Based on the foregoing, the Court concludes that summary judgment on Count III of the Complaint is not premature. The Court further finds that Plaintiff has conceded the validity of Claim No. 1413 and has failed to produce any evidence contesting the amount of Claim No. 1413 or otherwise creating a question of fact about the claim. Therefore, Defendant is entitled to summary judgment on Count III, and Claim No. 1413 will be allowed in full as a general unsecured claim.

### B. Count IV: Objection to § 503(b)(9) Request

In the Complaint, Plaintiff objects to Defendant's § 503(b)(9) Claim as duplicative of Claim No. 1062. Claim No. 1062 had been the subject of objection in Count II of the Complaint. However, Claim No. 1062 was withdrawn, and Plaintiff dismissed Count II as a result. [Doc. 21]. To the extent Count IV can be construed as objecting to § 503(b)(9) as duplicative of the Claim No. 1413, Plaintiff argues summary judgment is premature for the same reasons it gave for Count III. The Court disagrees with Plaintiff for the same reasons stated above. Plaintiff has acknowledged the apparent validity of the claim [Jacoby Declaration ¶ 6], Plaintiff controls the

Debtors' books and records but has not pointed to any documentation challenging the amount of the claim, and Plaintiff has had an opportunity to propound discovery but has not done so. Accordingly, Defendant is entitled to summary judgment on Count IV of the Complaint, and its § 503(b)(9) Claim will be allowed in full.

### C: Count VIII and Counterclaim II: Disallowance of § 503(b)(9) Claim Under § 502(d)

In its Response, Plaintiff states that it "withdraws Count VIII as a basis for objecting to the 503(b)(9) Claim." [Doc. 31 at 22]. But it continues to assert Count VIII as to Claim No. 1413. As Defendant only sought summary judgment as to the § 503(b)(9) Claim, and Plaintiff has conceded the issue, Defendant is entitled to summary judgment on Count VIII of the Complaint with respect to its § 503(b)(9) Claim and on Counterclaim II.

### D: Counterclaim I: Declaratory Judgment That the Same New Value May Be Used as a Defense to a Preference and as a Basis for a § 503(b)(9) Claim

Debtor made payments to Defendant during the 90-day prepetition period that the Court will assume for purposes of this analysis constitute preferences.[3] Also during that period, Defendant provided goods to Debtor subsequent to the payments. Under § 547(c)(4), Defendant can offset its preference liability to the extent of this "new value." Furthermore, to the extent the goods were provided during the 20 days prepetition, Defendant is entitled to an administrative expense claim under § 503(b)(9).[4] At issue is whether a creditor who delivered goods that

---

[3] A preference consists of a "transfer of an interest of the debtor in property—(1) to or for the benefit of a creditor; (2) for or on account of an antecedent debt owed by the debtor before such transfer was made; (3) made while the debtor was insolvent; (4) made—(A) on or within 90 days before the date of the filing of the petition; … (5) that enables such creditor to receive more than such creditor would receive if—(A) the case were a case under chapter 7 of this title; (B) the transfer had not been made; and (C) such creditor received payment of such debt to the extent provided by the provisions of this title." 11 U.S.C. § 547(b).

[4] The Bankruptcy Code provides for allowance as an administrative claim of "the value of any goods received by the debtor within 20 days before the date of commencement of a case under this title in which the goods have been sold

constituted new value to the debtor during the 20-day period prior to the bankruptcy filing can be

paid for that new value as an administrative expense under § 503(b)(9) and can use that same new

value to offset its preference liability under § 547(c)(4). This question turns on the language of §

547(c)(4), which provides as follows:

> (c) The trustee may not avoid under this section a transfer—
>
> …
>
> (4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—
>
> > (A) not secured by an otherwise unavoidable security interest; and
>
> > (B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor[.]

11 U.S.C. § 547(c)(4). Under this section, known as the subsequent new value defense, if the

debtor makes a preferential payment to the creditor and the creditor thereafter provides the debtor

with new value, that new value is a defense to a preference claim so long as the debtor does not

make an "otherwise unavoidable transfer" on account of that new value. Defendant argues that

payment on a § 503(b)(9) claim is not an "otherwise unavoidable transfer" and therefore the

payment does not reduce its new value defense. Plaintiff argues that payment on a § 503(b)(9)

claim is an "otherwise unavoidable transfer" such that the subsequent new value defense does not

apply to any new value covered by the claim. Both parties rely on the plain language of the statute

and bankruptcy policy in support of their positions.

---

to the debtor in the ordinary course of such debtor's business." 11 U.S.C. § 503(b)(9). Such claims are accorded priority under § 507(a)(2).

A bankruptcy judge in this district has previously held that "[a] creditor that delivered goods to the debtor pre-petition is not entitled to the new value defense under § 547(c)(4) when that creditor has been paid in full by a § 503(b)(9) claim." *TI Acquisition, LLC v. Southern Polymer, Inc. (In re TI Acquisition, LLC)*, 429 B.R. 377, 385 (Bankr. N.D. Ga. 2010) (Diehl, J.). The court compared § 503(b)(9) claims to rights of reclamation under § 546(c) and to critical vendor claims, finding reclamation claims to be more similar. *Id.* at 380. When an administrative expense claim has been or will be paid in full, it is like a reclamation claim because "the estate was not enhanced by the 'new value.'" *Id.* at 381. By contrast critical vendor claims are subject to negotiation with the debtor, including "how to deal with the potential preference liability of a critical vendor creditor, which can ensure than the value received by the debtor-in-possession is sufficient to justify the favored treatment." *Id.* at 382. Furthermore, a critical vendor payment is subject to the stringent *Kmart* test and is subject to the approval of the court; neither of which is true for a § 509(b)(3) claim. *Id.* (citing *In re Kmart Corp.*, 359 F.3d 866, 871-74 (7th Cir. 2004)). After also considering policy implications, the court concluded that "it would be inequitable and contrary to the statute to allow the new value defense to be used when the creditor has been paid in full, out of the debtor's estate, for the new value shipments." *Id.* at 385.

Defendant objects to reliance on *TI Acquisition* for a number of reasons. First, it is not a binding decision. Second, it was wrongly decided because (a) it did not apply the correct plain language analysis to determine that the term "transfers" in § 547 refers to prepetition transfers; (b) it was based on a faulty argument that allowing a § 503(b)(9) claim and subsequent new value defense for the same shipment results in a double payment to the creditor; and (c) § 503(b)(9) claims are not analogous to reclamation claims because unlike reclamation, a debtor can freely use goods subject to a § 503(b)(9) claim whether before or after the petition date. Third, *TI*

14

*Acquisition* is no longer good law after the Eleventh Circuit's decision in *Kaye v. Blue Bell Creameries, Inc. (In re BFW Liquidation, LLC)*, 899 F.3d 1178 (2018), and the Third Circuit's decision in *Friedman's Liquidating Trust v. Roth Staffing Companies LP (In re Friedman's Inc.)*, 738 F.3d 547 (3d Cir. 2013), which Defendant argues provides an analysis that is more faithful to the Bankruptcy Code. Fourth, the facts are distinguishable as the issues in *TI Acquisition* arose prior to confirmation whereas the issues in this case arose after the plan was confirmed and all the Debtors' assets were transferred to a Trust such that the Debtors are incapable of making an otherwise unavoidable transfer. Other than the non-binding nature of *TI Acquisition*, the Court disagrees with Defendant on each of these points and will address each of them in the discussion below.

As pointed out by Defendant, the Eleventh Circuit Court of Appeals recently interpreted § 547(c)(4) to determine whether the new value given by the creditor must remain unpaid and to determine the meaning of the term "otherwise unavoidable." *BFW Liquidation*, 899 F.3d 1178. *BFW Liquidation* involved a series of transactions that took place during the 90-day pre-petition preference period, including 13 payments by the debtor. After each payment, the creditor, Blue Bell, delivered products (i.e., new value) to the debtor. *Id.* at 1183-84. Unlike this proceeding, no post-petition payments by the debtor on account of the new value were at issue in *BFW Liquidation*. However, it offers a useful framework for analysis.

In *Charisma Investment Company, N.V. v. Airport Systems, Inc. (In re Jet Florida System, Inc.)*, 841 F.2d 1082 (11th Cir. 1988), the court stated that the subsequent new value defense generally requires: "(1) that the creditor must have extended the new value after receiving the challenged payments, (2) that the new value must have been unsecured, and (3) that the new value must *remain unpaid*." *Id.* at 1083 (emphasis added). As a result, the bankruptcy court in

*BFW Liquidation* held that the subsequent new value defense is only available to the extent the new value remains unpaid.[5] 899 F.3d at 1182. The circuit court concluded that the "remains unpaid" language in *Jet Florida* was dictum because it was not at issue in that case. *Id.* at 1187. The court in *TI Acquisition* made the same point, noting that courts fall into two categories: those that adopt the "remains unpaid" approach (in which only unpaid new value can offset preference liability) and those that adopt a "subsequent advance approach" (which does not require the new value to remain unpaid). 429 B.R. at 382-83. The court in *TI Acquisition* stated that the holding in *Jet Florida* was "not at odds with the subsequent advance approach" because the case "did not involve a determination of the meaning of § 547(c)(4)(B)[.]" *Id.* at 383-84. Thus, Defendant's argument that *TI Acquisition* is inconsistent with *BFW Liquidation* is unpersuasive.

Having determined that the "remains unpaid" language was dictum, the Eleventh Circuit went on to hold that § 547(c)(4) does not require new value to remain unpaid. 899 F.3d at 1189.

> Instead, the plain language of the statute requires only that (1) any new value given by the creditor must not be secured by an otherwise unavoidable security interest and (2) the debtor must not have made an otherwise unavoidable transfer to or for the benefit of the creditor on account of the new value given.

*Id.* In so concluding, the court noted that both the Seventh and Third Circuits require new value to remain unpaid, but that in *Friedman's*, the Third Circuit said an earlier decision "was not a holding with respect to whether post-petition payments could affect a creditor's subsequent-new-value

---

[5] The Eleventh Circuit characterized the bankruptcy court's ruling as requiring the new value to remain unpaid "as of the date the bankruptcy petition was filed." 899 F.3d at 1182, 1185. However, the bankruptcy court did not include any such limitation in its order and the Eleventh Circuit made no further mention of this timing issue. *See Kaye v. Blue Bell Creameries, Inc. (In re BFW Liquidation, LLC)*, No. 09-00634, AP No. 11-00063, 2016 WL 7383719, at *7 (Bankr. N.D. Ala. Dec. 20, 2016). The bankruptcy court did say, "Blue Bell is entitled to the new value defense only to the extent that the new value it extended remains unpaid." *Id.* at *9.

16

defense." *Id.* at 1189 n.9.[6] *Friedman's* ultimately held that post-petition payments by the debtor under a critical vendor order do not affect the subsequent new value defense. 738 F.3d at 561. The Eleventh Circuit did not express any view on the propriety of the holding in *Friedman's*. Stating that it did not need to look beyond the plain language of the statute, the Eleventh Circuit nevertheless found that both the statutory history and bankruptcy policy supported its interpretation of § 547(c)(4) that new value does not have to remain unpaid. 899 F.3d at 1190, 1193.

The court then considered the meaning of the term "otherwise unavoidable" in § 547(c)(4)(B). *Id.* at 1196. The debtor had made payments to Blue Bell after receiving new value and those payments were themselves avoidable as preferences. *Id.* at 1198. The trustee argued that the payments must be avoidable under a provision other than § 547, such as the fraudulent transfer provisions of § 548. *Id.* The court disagreed, stating that "the Trustee's argument largely renders § 547(c)(4) an empty set" because although the payment on account of new value could not be clawed back under § 547, it would be avoided under § 548. *Id.* Defendant argues that in so stating, the court limited the meaning of "otherwise unavoidable" to preferential transfers that are unavoidable based on a defense in § 547(c) other than the subsequent new value defense. To the contrary, the court found that "otherwise unavoidable" does not exclude the other defenses in § 547(c), but neither does it exclude any other defense to avoidance. *Id.* The court interpreted "otherwise unavoidable" to mean "a transfer that is unavoidable for reasons other than § 547(c)(4)'s subsequent-new-value defense." *Id.*

---

[6] In *Friedman's*, the Third Circuit considered whether it was bound by language in *In re New York City Shoes, Inc.*, 880 F.2d 679 (3d Cir. 1989), in which it said of § 547(c)(4): "the debtor must not have fully compensated the creditor for the 'new value' *as of the date that it filed its bankruptcy petition*." *Id.* at 680 (emphasis added). Because none of the payments in *New York City Shoes* were made post-petition, the court concluded the language was non-binding dicta. 738 F.3d at 552.

In *BFW Liquidation*, the Eleventh Circuit made very clear that new value does not

have to remain unpaid but does have to be otherwise avoidable to constitute new value credit. *Id.*

at 1189. Payments under § 503(b)(9), like those at issue in this proceeding, are not otherwise

avoidable. Section 549 of the Bankruptcy Code provides for avoidance of post-petition transfers

by the debtor unless authorized by the Code or the Court. 11 U.S.C. § 549(a). Because the Code

authorizes the payment of § 503(b)(9) expenses, they are not avoidable under § 549 or any other

section of the Code. This raises the question of whether an otherwise unavoidable transfer

constitutes new value if it is paid post-petition, which is a matter of statutory construction that has

divided the courts. *Compare Friedman's*, 738 F.3d at 562 (post-petition payments made under a

wage order do not affect the creditor's preference liability); *Phoenix Rest. Grp., Inc. v. Ajilon Prof.*

*Staffing LLC (In re Phoenix Rest. Grp., Inc.)*, 317 B.R. 491, 496 (Bankr. M.D. Tenn. 2004) (post-

petition payments made by the debtor do not affect the creditor's preference liability); *Commissary*

*Operations, Inc. v. Dot Foods, Inc. (In re Commissary Operations, Inc.)*, 421 B.R. 873, 878-79

(Bankr. M.D. Tenn. 2010) (a § 503(b)(9) claim does not reduce the availability of the new value

defense) *with Gonzales v. Sun Life Ins. Co. (In re Furr's Supermarkets, Inc.)*, 485 B.R. 672, 734

(Bankr. D.N.M. 2012) (post-petition payments made under an employee benefits order can be used

to limit the creditor's new value defense); *Hall v. Ford Motor Credit Co., (In re JKJ Chevrolet,*

*Inc).*, 412 F.3d 545, 553 n.6 (4th Cir. 2005) ("While post-petition transfers [under a floor plan

financing arrangement] may be considered under section 547(c)(4)(B), … neither party has

addressed whether the post-petition transfers that occurred in the instant case were unavoidable.");

*TI Acquisition*, 429 B.R. at 385 (creditor cannot receive both payment on a § 503(b)(9) claim and

receive a new value credit for the same goods); *Circuit City Stores, Inc. v. Mitsubishi Digital Elec.*

*Am., Inc. (In re Circuit City Stores, Inc.)* ("Circuit City I"), No. 08-35653, AP 10-3068, 2010 WL

4956022 at *9 (Bankr. E.D. Va. Dec. 1, 2010) (same); *Circuit City Stores, Inc. v. Sony Elec., Inc. (In re Circuit City Stores, Inc.)* ("Circuit City II"), 515 B.R. 302, 314 (Bankr. E.D. Va. 2014) (same).

### 1. Plain Language

When the language of a statute has "a plain and unambiguous meaning with regard to the particular dispute in the case and the statutory scheme is coherent and consistent, the inquiry is over." *BFW Liquidation*, 899 F.3d at 1188 (internal quotation marks and citations omitted). To determine whether the language is plain and unambiguous, the court considers "the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Id.* (internal quotation marks and citations omitted).

The Eleventh Circuit described the general structure and the language of § 547 as follows: Section 547(b) allows the trustee to avoid certain transfers made by the debtor on account of an antecedent debt if the transfer was made during the 90-day period before the petition date. *Id.* The burden of proof for establishing that a transfer is avoidable is on the trustee. *Id.* (citing 11 U.S.C. § 547(g)). If the trustee avoids the transfer, any claim the creditor has against the estate is disallowed until the creditor pays the trustee, after which the creditor will have an unsecured claim for the amount recovered by the trustee. *Id.* and n.8. (citing 11 U.S.C. §§ 502(d), (h)). Section 547(c) sets forth various defenses the creditor may raise to avoidance, including the subsequent new value defense in subsection (c)(4). *Id.* at 1188-89. The creditor has the burden of proving the defense applies. *Id.* at 1189 (citing § 547(g)).

### a. Transfer by the Debtor

The Court will begin with Defendant's argument that its administrative expense claim does not offset its subsequent new value defense because there has been no payment by

19

Debtor. Section 547(c)(4) requires that "*the debtor* did not make an otherwise unavoidable transfer" on account of new value. Defendant argues that payment of a § 503(b)(9) claim does not result in a transfer from the debtor but rather is a distribution from the estate. Therefore, it cannot limit Defendant's new value defense. Defendant contends its interpretation is supported by other sections of the Bankruptcy Code, including: (a) § 1129(a)(9)(A), which provides that holders of § 503(b)(9) claims "will receive on account of such claim cash equal to the allowed amount of such claim" on the effective date of the Chapter 11 plan and does not refer to the payment as a transfer; (b) § 726(a), which recognizes that payments from the estate are distributions; (c) § 1143, which recognizes that payments under a confirmed plan are distributions; (d) § 1222(b)(8), which refers to "distribution" of property of the estate; (e) § 1225(b)(1)(C), which refers to distributions under the plan; and (f) § 1329(a)(3), which deals with plan modifications that alter the amount of distributions to creditors. Defendant argues that Congress did not use the term "transfer" when talking about payments under a plan because transfers and distributions are distinct concepts. Distributions are limited to situations where estate property is distributed to creditors under a confirmed plan or pursuant to § 726.

The Court disagrees with Defendant. The Bankruptcy Code defines a transfer as "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with— (i) property; or (ii) an interest in property." 11 U.S.C. § 101(54)(D). Nothing in the definition of "transfer" excludes distributions. While not all transfers are distributions, all distributions—or at least those at issue in this proceeding—are transfers.

It is true that Plaintiff, as liquidating trustee, has not actually paid Defendant's § 503(b)(9) claim, but it does maintain sufficient reserves to pay all such claims in full. [Case No. 17-41677, Doc. 631 (the Plan) ¶ 2.02 & Art. VIII; Sched. 6.02 (the Liquidating Trust Agreement)

¶ 5.4, providing for payment of administrative expense claims in full and establishing reserves for disputed claims]. The subsequent new value defense requires an unavoidable "transfer," not an unavoidable "payment." The reserve fund satisfies this definition. *See Circuit City I*, 2010 WL 4956022, at *6.

To the extent Defendant argues that because Debtor transferred all its assets to the Trust, Debtor cannot make an otherwise unavoidable transfer, the Court is equally unpersuaded. The fact that Debtor has transferred all its assets to a Trust does not mean Debtor is incapable of paying the § 503(b)(9) Claim. Any such payment would ultimately come from Debtor; the Trust is a pass-through vessel through which Debtor's assets flow pursuant to the Plan and Confirmation Order. The Plan provides that for tax purposes the transfer of Debtor's assets into the Trust is deemed a transfer to holders of allowed claims followed by a deemed transfer from the Trust beneficiaries to the Trust. [Doc. 631 ¶ 6.03]. And the Trust beneficiaries are deemed the owners of the Trust assets. [Id. ¶ 6.04]. Thus, a payment on a § 503(b)(9) claim is either a transfer from Debtor to the Trust for the benefit of creditors or a deemed transfer directly to the Defendant and then to the Trust for income tax purposes.

### b. Temporal Limitations on the Payment of New Value

In *BFW Liquidation*, the court found nothing in the language of the statute that requires new value to remain unpaid for purposes of the subsequent new value defense.

> Instead, the plain language of the statute requires only that (1) any new value given by the creditor must not be secured by an otherwise unavoidable security interest and (2) the debtor must not have made an otherwise unavoidable transfer to or for the benefit of the creditor on account of the new value given.

899 F.3d at 1189.

Plaintiff argues that in stating that these are the only two requirements, the Eleventh Circuit implicitly recognized there is no temporal limitation on the debtor's transfer on account of new value. Defendant argues that § 547, as a whole, is a backward-looking statute, and therefore the "transfer" referenced in § 547(c)(4) is limited to prepetition transfers.

Defendant argues the "transfer" in § 547(b) must occur during the prepetition preference period to be avoidable. In addition, the introductory language in § 547(c) provides that the trustee may not avoid "under this section a transfer" that meets one of the defenses. The "transfer" is referring to one that meets the requirements of a preference, including having been made during the prepetition preference period. Because these two parts of § 547 refer to prepetition transfers, then the phrase "otherwise unavoidable transfer" is also clearly referring to a prepetition transfer. The Third Circuit in *Friedman's* rejected a similar argument as "without merit" stating that "[w]hile in two instances in § 547(c)(4) 'transfer' is clearly modified in a way referring back to the 90-day period, in the last instance, referring to the 'otherwise unavoidable transfer' issue here, it is not." 738 F.3d at 555.

On this point, the Court agrees with *Friedman's*. As set forth above, the word "transfer" is broadly defined to include all modes of disposition of property. 11 U.S.C. § 101(54)(D). Congress has defined a preference as a transfer by the debtor made during the 90 days prior to the bankruptcy filing. *Id.* § 547(b)(4)(A). Congress did not similarly limit subsequent transfers by the debtor on account of new value—which is different and distinct from the preferential transfer; although it may also independently qualify as a preference, the statute does not require it to be a preference.

Defendant further contends its position is supported by the language "on account of which new value the debtor *did not make* an otherwise unavoidable transfer." *Id.* § 547(c)(4).

22

Because the provision uses the past tense, it is looking backward in time to what the debtor did as opposed to looking forward in time, according to Defendant. However, nothing in the statute designates the petition date as the cut-off point for the lookback period as opposed to the date at which preference liability is determined or some other date.

While the Eleventh Circuit found the plain language of § 547 to be determinative in *BFW Liquidation*, the Third Circuit in *Friedman's* relied "on the context and policy of the Code, rather than specific language" to determine that payments on account of new value must be made pre-petition in order to offset the creditor's preference liability. 738 F.3d at 554. At issue in *Friedman's* was a wage order issued by the bankruptcy court that authorized the debtor to make post-petition payments to the creditor, a staffing agency, for prepetition services. *Id.* at 550. The Third Circuit noted that such payments were analogous to payments under § 503(b)(9). *Id.* at 553 n.2. The court acknowledged some appeal to the argument that the absence of language in the statute setting a time limit on payments made on account of new value indicates there is no limit. *Id.* at 554. However, the court said that such an interpretation "does not take into account the context in which the provision is found. If we read the statute in this manner, the time period involved would be totally open-ended such that any payment, at any time, could defeat a new value defense." *Id.* The court did not think Congress intended such a result. *Id.*

The Eleventh Circuit reached a different conclusion about congressional silence in the same provision. In deciding that new value need not remain unpaid, the court stated that "[b]y its plain terms … the statute only excludes 'paid' new value that is paid for with 'an otherwise unavoidable transfer.'" 899 F.3d at 1189. The court found the statutory history supported its reading of that plain language. *Id.* at 1190. Section 60(c) of the Bankruptcy Act of 1898 (the

"Bankruptcy Act"), codified at 11 U.S.C. § 96(c), was the predecessor to § 547(c)(4). It provided as follows:

> If a creditor has been preferred, and afterward in good faith gives the debtor further credit without security of any kind for property which becomes a part of the debtor's estate, the amount of such new credit *remaining unpaid at the time of the adjudication* in bankruptcy may be set off against the amount which would otherwise be recoverable from him.

11 U.S.C. § 96(c) (1976) (emphasis added). The Eleventh Circuit stated that "in the absence of any evidence to the contrary, one can plausibly infer that, by replacing § 60(c)'s 'remaining unpaid' language with new language that omits any such requirement, Congress intended to eliminate § 60(c)'s requirement that new value remain unpaid, and to replace that requirement with something substantively different." *Id.* at 1191.

The same can be said of the "time of the adjudication" language in the predecessor statute. Section 60(c) included a temporal limitation on payments made on account of new value, and any such limitation was excluded from § 547(c)(4). The Court can reasonably infer that the change was intentional. Further indication that the omission was intentional is found in § 547(c)(5), which is limited to transfers made "as of the date of the filing of the petition," as it shows Congress knew how to impose such a limitation when it intended to do so. 11 U.S.C. § 547(c)(5).

The Court recognizes that the legislative history of § 547(c)(4) does not support this view. The legislative history states: "The fourth exception codifies the net result rule in section 60c of current law. If the creditor and the debtor have more than one exchange *during the 90-day period*, the exchanges are netted out according to the formula in paragraph (4)." S. Rep. 95-989 (1978), 1978 U.S.C.C.A.N. 5787, 5874. However, the best evidence of Congress' intent is the language of the statute, which does not include any requirement that the otherwise unavoidable transfers take place pre-petition. And, when the language of the statute is plan and unambiguous,

24

it cannot be overcome by the legislative history. *See American Gen. Fin., Inc. v. Paschen (In re Paschen)*, 296 F.3d 1203, 1207 (11th Cir. 2002).

### 2. The Third Circuit's Opinion in *Friedman's*

*BFW Liquidation* does not address the effect of post-petition payments on the subsequent new value defense. But *Friedman's* does address that issue, albeit in the context of a wage order rather than a § 503(b)(9) claim, and concludes that only pre-petition payments should be included in the calculation of preference liability. The Third Circuit offered five reasons for its determination that the statutory context supports a temporal limitation on the new value defense despite the omission of any such language from the statute: (1) § 547 is titled "Preferences" and therefore all calculations of liability relate to the pre-petition preference period; (2) the hypothetical liquidation test in § 547(b)(5) is performed as of the petition date, and "[e]xtending preference analysis past the petition date would be inconsistent with § 547(b)(5)";[7] (3) the statute of limitations for a preference complaint begins on the petition date, and the calculation of liability could change based on the date the complaint is filed if post-petition payments can defeat the new value defense; (4) § 547(c)(5) includes the phrase "as of the date of the filing of the petition," which demonstrates that Congress intended to limit the calculation of preference liability to prepetition activity;[8] and (5) if post-petition payments by the debtor are allowed in the calculation of preference liability, then post-petition extensions of new value must also be allowed, contrary to the conclusion of the majority of courts. 738 F.3d at 555-57. The Court respectfully disagrees with the Third Circuit because, based on the *BFW Liquidation* opinion, this Court is persuaded the Eleventh Circuit would be more likely to find that the lack of a temporal limit was intentional.

---

[7] 738 F.3d at 556.

[8] The court recognized the converse argument that the inclusion of a temporal limitation in § 547(c)(5) shows the omission of similar language in § 547(c)(4) was intentional. 738 F.3d at 556.

Addressing each of the Third Circuit's arguments in turn: First, the title of § 547 is "Preferences." The Court may consider the title of a statute to resolve an ambiguity in the text of a statute, but the title of a statute "cannot trump the plain meaning of its text." *United Mine Workers of Am. Combined Benefit Fund v. Toffel (In re Walter Energy, Inc.)*, 911 F.3d 1121, 1154 n.38 (11th Cir. 2018) (citing *Brotherhood of R.R. Trainmen v. Baltimore & O.R. Co.*, 331 U.S. 519, 528-29, 67 S. Ct. 1387, 1392 (1947)). Here, the text is plain and unambiguous. It does not include any requirements regarding the timing of a debtor's payment of new value for defensive purposes. Nor does this Court find the title persuasive in construing defenses to preferences and whether a temporal limit should be implied when none is express, especially when considering the differences between § 547(b) and § 547(c). *See, e.g., Barnhill v. Johnson*, 503 U.S. 393, 402, 112 S. Ct. 1386, 1391 (1992) (noting that subsection (c) provides exceptions to subsection (b), that the two subsections have different policy considerations, and that given these distinctions, a legislative statement about subsection (c) should not be used to interpret subsection (b)).

In *Barnhill*, the Court concluded that for purposes of the prima facie preference case, a transfer made by check occurs on the date the check is honored by the bank, rather than the day the check is received by the creditor. *Id.* at 394-95, 112 S. Ct. at 1388. Nevertheless, the Court recognized—without taking a position on—circuit court authority that the date of delivery of a check applies to the preference defenses under § 547(c). *Id.* at 402 n.9, 112 S. Ct at 1391 n.9 (collecting cases). The date of delivery rule remains good law for preference defenses after *Barnhill*. 5 Collier on Bankruptcy ¶ 547.04[4][b] (16th ed.); *see also Hall-Mark Elec. Corp. v. Sims (In re Lee)*, 108 F.3d 239, 240-41 (9th Cir. 1997) ("The Supreme Court has held that, for purposes of [§ 547(b)], a transfer accomplished by means of an ordinary check takes place … on the day it is honored[.] … A different rule for time of transfer applies, however, under the 'new

value' exception of § 547(c)(4)[.]") Section 547(b) advances the bankruptcy policy of equality of distribution among creditors, which depends on when funds are actually depleted. *Brown v. Shell Canada Ltd. (In re Tennessee Chemical Co.)*, 112 F.3d 234, 238 (6th Cir. 1997). By contrast, applying the date-of-delivery rule to transfers under § 547(c) encourages creditors to continue transacting business on ordinary terms with financially distressed creditors; thus furthering the rehabilitative purpose of bankruptcy. *Id.* "[I]f the time of transfer of a currently dated check were deemed to be the date that the check cleared the bank, shaky companies may be pressured because creditors might wait longer before shipping them goods." *New York City Shoes*, 880 F.2d at 683.

Second, the fact that the hypothetical liquidation test in § 547(b)(5) is performed as of the petition date is not inconsistent with allowing post-petition payments by the debtor to offset the new value defense. As cited by the Third Circuit and explained in Collier on Bankruptcy,

> Section 547(b)(5) codifies the Supreme Court's holding in *Palmer Clay Products Co. v. Brown*: Whether a particular transfer is preferential is to be determined "not by what the situation would have been if the debtor's assets had been liquidated and distributed among his creditors at the time the alleged preferential payment was made, but by the actual effect of the payment as determined when bankruptcy results." All other elements of a preference … are determined at the time the transfer is made.

5 Collier on Bankruptcy ¶ 547.03[7] (16th ed.) (quoting *Palmer Clay Prod. Co. v. Brown*, 297 U.S. 227, 229, 56 S. Ct. 450, 451 (1936)); *Friedman's*, 738 F.3d at 556. Thus, under the prima facie case for a preference, different time periods apply to different elements to carry out the purpose of the preference statute. The Court in *Palmer Clay* was interpreting sections 60(a) and 60(b) of the Bankruptcy Act, which did not expressly include a hypothetical liquidation test. Under § 547, different time periods continue to apply to different parts of the statute, as Judge Diehl pointed out in *TI Acquisition*.

27

> The preference period only involves transfers by the debtor that occur pre-petition, but the defense of § 547(c)(4) does not limit itself to the pre-petition period. Indeed, the requirements for making out a *prima facie* case for preference recovery include a determination of the extent of payment a creditor would receive in a Chapter 7 case. Post-bankruptcy facts are thus required for proper consideration of § 547 recovery actions. The holder of an administrative claim in a Chapter 7 case—even one created post-petition by § 503(b)(9)—is treated differently than other unsecured creditors. That post-petition fact may impact whether a trustee is able to make out a *prima facie* case under 11 U.S.C. § 547(b)(5).

429 B.R. at 385.

Third, with regard to the statute of limitations, there is some logic to the argument that the cause of action must accrue on the date the statute of limitations begins to run (in this case, the petition date)[9] and some appeal to having a fixed point at which a preference amount can be determined and defenses anticipated. However, generally, the preference analysis cannot be done at the petition date—even when § 509(b)(3) claims are absent from the calculus—because of many unknowns with respect to the exact amount of payments, when payments cleared, and when checks or other payments were initiated. This fact is part of the reason why preference actions are rarely brought early on in a case such that from a practical standpoint, this concern is of little effect. Furthermore, Congress can and has imposed a different limitations period for some avoidance actions. For example, § 549 has a separate statute of limitations that requires the claim to be brought by the earlier of two years after the transfer sought to be avoided or the time the bankruptcy case is closed or dismissed. 11 U.S.C. § 549(d). Therefore, the statute of limitations argument is not persuasive.

Fourth, in rejecting the argument that inclusion of the petition date limitation in § 547(c)(5) and exclusion of the same language from § 547(c)(4) indicates congressional intent not

---

[9] 11 U.S.C. § 546(a).

to impose a temporal limit on new value, the Third Circuit concluded that the policy of improvement of position prior to the petition date was central to the concept of preference and thus was not swayed. 738 F.3d at 556. This Court disagrees. Requiring both payment of the § 503(b)(9) claim and offset of preference liability improves the creditor's position relative to all other creditors that continued to do business with the debtor and received preferential payments by giving the § 503(b)(9) claimant payment for the new value plus reducing what it must repay, which in turn reduces the amount available to pay all general unsecured creditors. This "payment plus" treatment, while not double-dipping in the sense that Defendant is not being paid twice for the same invoice, undercuts equality of treatment while failing to materially advance the policy of encouraging creditors to continue to do business on credit with the debtor.

The preference section was enacted to prevent creditors from racing to the courthouse to dismantle a financially distressed debtor, which in turn promotes equality of distribution among similarly situated creditors. *BFW Liquidation*, 899 F.3d at 1193. The preference defenses were enacted to encourage creditors to continue doing business with such debtors under usual practices. *See id.* The subsequent new value defense reflects the understanding that when a debtor makes a preferential payment to the creditor—thereby depleting the pool of funds available to other creditors—that pool is replenished when the creditor subsequently provides new value to the debtor. If the debtor makes a further payment on account of the new value that is itself avoidable, then status quo is maintained. But if the debtor makes a further payment on account of the new value that cannot be clawed back, the estate is once again depleted, and the new value cannot be used to offset preference liability. The clear language of the statute implements this leveling of the playing field and equality of distribution by carving out only payments made with otherwise unavoidable transfers.

29

Defendant contends its position does not run afoul of the policy of equality of distribution because only similarly situated creditors must be treated equally. By giving Defendant an administrative expense claim for goods delivered to the Debtors in the 20 days prior to the petition date, Congress afforded Defendant a priority status that is entitled to better treatment than general unsecured creditors to the extent of its administrative expense claim. Defendant argues there is no indication Congress intended § 503(b)(9) to displace § 547(c)(4) defenses. Nevertheless, the Court disagrees with Defendant, and agrees with *TI Acquisition* on the policy analysis. The court in *TI Acquisition* likened fully funded § 503(b)(9) claims to reclamation claims as, in either case, the creditor is not vulnerable to non-payment and the estate is not enhanced by any new value given based on those claims. 429 B.R. at 381. Furthermore, § 503(b)(9) does not affect the incentives for creditors to work with distressed debtors:

> When a creditor ships goods pre-petition, … the creditor never knows whether a bankruptcy will be filed within 20 days of receipt of the shipment. The creditor cannot, therefore, know that it may be able to assert a § 503(b)(9) claim. From the creditor's pre-petition perspective, there is no difference in incentive if the new value defense the creditor may have relied on is lost as a result of a § 503(b)(9) claim.

*Id.* at 385.

Finally, the Third Circuit reasoned that if post-petition payments by the debtor are allowed in the calculation of preference liability, then post-petition extensions of new value must also be allowed, contrary to the conclusion of the majority of courts. Defendant extends this argument by contending that distributions on a creditor's general unsecured claim would also have to be included in the calculation of preference liability as there is no means to avoid them under the Code. As a result, the calculations would be a moving target and would require inconsistent interpretations of the meaning of "otherwise unavoidable transfer."

When courts have barred post-petition new value from offsetting preference liability, "[o]ne reason given is that 'the specific language "to or for the benefit of the debtor" [implies] that the subsequent advances of new value are only those given pre-petition, because any post-petition advances are given to the debtor's estate, not the debtor.'" *Wiscovitch-Rentas v. PDMC Assoc., S.E. (In re PMC Marketing Corp.)*, 518 B.R. 150, 157 (B.A.P. 1st Cir. 2014) (quoting *Clark v. Frank B. Hall & Co. of Colo (In re Sharoff Food Serv., Inc.)*, 179 B.R. 669, 678 (Bankr. D. Colo. 1995); *Bergquist v. Anderson-Greenwood Aviation Corp. (In re Bellanca Aircraft Corp.)*, 850 F.2d 1275, 1284 (8th Cir. 1988)); *see also Rocin Liquidation Estate v. Alta AH&L (In re Rocor Int'l, Inc.)*, 352 B.R. 319, 333 (Bankr. W.D. Okla. 2006) (stating without analysis that "post-petition advances of new value may not be included in the subsequent new value analysis"); *Miller v. A&M Oil Co., Inc. (In re Smith Min. & Material, LLC)*, 405 B.R. 589, 594 (Bankr. W.D. Ky. 2009) (same). As such, post-petition advances of new value *to the debtor* can be distinguished from post-petition payments *to the creditor* on account of new value. In addition, post-petition new value does not advance the policy of encouraging creditors to continue doing business with financially distressed debtors. *Sharoff Food Serv.*, 179 B.R. at 678; *see also Kellman v. P.S.E. & G (In re Jolly N, Inc.)*, 122 B.R. 897, 909–10 (Bankr. D.N.J. 1991) ("To allow a creditor to offset post-petition advances against preferential transfers would be contrary to other provisions of the Code dealing with post-petition advances, would possibly prejudice the interests of other creditors, and would ignore the orderly mechanisms established by Congress to protect all interested parties concerned.") (internal quotation marks and citations omitted).

The orderly mechanisms of the Code provide for administrative expenses claims for creditors who advance new value post-petition. 11 U.S.C. § 503(b)(1)(A). If creditors who have advanced new value in goods or services post-petition were also permitted to use this new value

31

to reduce preference liability under § 547(c)(4) they would be receiving payment plus reducing the amount of preference liability owed to the estate. This "payment plus" directly undercuts the policy of equality of distribution that is the most important policy underpinning § 547 of the Code and an animating policy for the entire Code.

Similarly, with respect to Defendant's argument regarding post-petition payments on the general unsecured claims of preference creditors who have provided new value,[10] the circumstances are not comparable as it does not result in the same "payment plus" treatment that § 503(b)(9) claims would receive under Defendant's approach.[11] The payment plus approach advocated by Defendant with regard to § 503(b)(9) claims results in a penalty to unsecured creditors generally, and more specifically, to those unsecured creditors who repaid preferences but do not have § 503(b)(9) claims. If the Court were to accept Defendant's argument, it would be paid in full for its § 503(b)(9) claim, which would result in a smaller return to other unsecured creditors as the pool of funds to be divided among them would be decreased by the amount Defendant's preference liability decreased. The § 503(b)(9) creditor would have a smaller § 502(h) claim by virtue of its full payment on its § 503(b)(9) claim, but this reduction would not compensate other creditors as its real value is some percentage on the dollar that would be paid to general unsecured creditors (in the unlikely event of a 100% distribution in a case, the result may be different). In contrast, creditors who supplied the debtor with goods during the preference period but not during the last 20 days would receive payment on § 502(h) claims and their other general unsecured claims

---

[10] In Counterclaim II, Defendant asks for a declaratory judgment that neither distribution on its § 503(b)(9) Claim *nor* on its general unsecured claim limits its use of the new value defense.

[11] Additionally, it is difficult if not impossible to make a final calculation on distributions to general unsecured claims until the total amount of both preference liability and allowed general unsecured claims has been established. If the distributions on general unsecured claims could alter preference liability under § 547(c)(4), which in turn alters the amount of the general unsecured claim, then where does it end? Congress cannot have intended to create such an endless loop. The same loop does not arise with § 503(b)(9) claims, because once the amount of such a claim is determined, then the preference liability and any resulting general unsecured claim can both be calculated with finality.

(if any) at a reduced rate because the recovery to the estate is reduced by the use of a fully paid §

503(b)(9) claim as new value. Thus, general unsecured creditors are penalized by the reduction of

the amount available to pay its claims while the § 503(b)(9) claimant is receiving payment in full

plus new value credit, which reduces what it must pay to the estate on account of its preference

liability. The overriding goal of equality of distribution is undercut if such creditors are treated as

"payment plus" or "priority plus" creditors while other unsecured creditors, including those who

have had to return preferential payments are penalized by the decrease in the pool of funds

available for distribution at the end of the case. Further, as discussed above, allowing payment plus

to creditors such as Defendant undercuts the structure of the Code. Accordingly, the plain language

of §547(c)(4) is consistent with the holistic interpretation of the statutes that make up the Code

and provide additional support for the Court's conclusion.

### 3. Defendant Cannot Use Its New Value Twice

In light of the foregoing discussion, the Court concludes that there is no temporal

requirement in § 547(c)(4) for the debtor's transfer on account of new value. Accordingly, when a

creditor has a claim under § 503(b)(9) and a defense under § 547(c)(4) and when the debtor has

established reserves to pay administrative claims in full, then that reserve constitutes an "otherwise

unavoidable transfer" by the debtor, and the new value represented by the § 503(b)(9) claim cannot

be used to offset the creditor's preference liability. Therefore, Defendant is not entitled to summary

judgment on Counterclaim I with respect to its § 503(b)(9) Claim.

### IV: Conclusion

Based on the foregoing, it is ORDERED that:

Defendant's Motion is GRANTED with respect to Count III of the Complaint;

Defendant's Motion is GRANTED with respect to Count IV of the Complaint;

33

Count VIII of the Complaint is deemed withdrawn solely as to Defendant's §

503(b)(9) Claim and Defendant's Motion is GRANTED with respect to Counterclaim II; and

Defendant's Motion is DENIED as to Counterclaim I with respect to its § 503(b)(9)

Claim and GRANTED as to Counterclaim I with respect to its general unsecured claim.

**END OF ORDER**

**<u>Distribution List</u>**

J. Hayden Kepner, Jr.
Scroggins & Williamson, P.C.
One Riverside, Suite 450
4401 Northside Parkway
Atlanta, GA 30068

J. Robert Williamson
Scroggins & Williamson, P.C.
One Riverside, Suite 450
4401 Northside Parkway
Atlanta, GA 30327

Michael D. Fielding
Suite 1000
4801 Main Street
Kansas City, MO 64112

Caleb T Holzaepfel
Husch Blackwell LLP
Suite 300
736 Georgia Avenue
Chattanooga, TN 37402